Frank Cozio for three Homer police officers and the City of Homer. This is an interlocutory appeal from the denial of qualified immunity. The underlying claims were Fourth Amendment, Fourteenth Amendment, and state tort claims. I'd like to reserve five minutes for rebuttal. Okay. And it counts down and keep track. Yes, I will. Thank you. I have a quick question for you that really wasn't much in the briefs. And that is, do we have jurisdiction over this matter? This is an interlocutory appeal based upon a ruling, a summary judgment motion without prejudice. You've got at least two significant issues of material fact. Why are we hearing this case at this point? I do not believe those issues of material fact are significant and would not alter your analysis. Let me ask you this. The two issues I'm talking about are whether the children were being held as hostages against their will or whether they were simply passengers. It makes a huge difference in the case law. Secondly, whether the defendant officers had time to deliberate before putting the defendants in danger by boxing in the car. Also, a huge issue. Yes. Why aren't those issues the kinds of issues that ought to be given to the jury? Because the underlying facts are not disputed in order to reach a conclusion. And we believe there's only one conclusion that can be reached from those undisputed facts. Well, I know you treat it as a matter of law, but I'm having difficulty getting there why those aren't classic factual issues. If they are, do you agree that we really don't have a jurisdiction to hear an interlocutory appeal of this nature? Yes. You do agree? Okay. Yes. So then part of this just stems on our view of whether these two issues are, in fact, material issues of fact and not issues of law. Yes. Okay. Yes, that is my view. Because the underlying facts are not disputed, and I'll try to illustrate why I think there's only one reasonable conclusion. I want to make sure that we're straight on what the law is here. You moved for summary judgment based on qualified immunity. Yes. You were denied summary judgment. The district court, having concluded that there were issues of material fact, correct? Yes. And you're appealing, saying you were entitled to summary judgment. That is to say you did not have to go forward toward trial, and the qualified immunity defense allows you not only to win in the sense of no damages, but it's immunity from trial. That's the theory? Yes. That is the theory, Your Honor. Okay. Yes. Our precedent is very clear on that point, that we have jurisdiction over such an appeal. Okay. Thank you. When Jason Anderson refused to come into the terminal, the risk of harm to the children could no longer be eliminated. The risk of harm to the children can only be balanced against other risks. The information given to law enforcement by Jerry Dietzman that he would not separate himself from the children turned out to be true because he would not come into the terminal. He was using the children as a shield against any arrest. Law enforcement could not decide they were simply never going to arrest him. That would not be good public policy. Now, what exactly did the wife say, that he would never leave the children? Yes, never leave the children. And Deputy Quinn, U.S. Marshal Deputy Quinn, heard that, that he would never separate himself from the children. Clear in the record. Undisputed. And for this purpose, we're required to think that that's true? I mean, the kids go to sleep, he's never going to go out to the grocery store without them? Never, never, never? Yes. I mean, I know lots of parents. It's a very unusual parent that will never, never, never leave the child. After he pointed the gun at the mother and she fled, she concluded that she couldn't get the children from him, and she concluded he's not going to separate himself from the children. But that's different from saying never, never leave them. She also said that she was afraid for the children's lives from him, correct? Oh, yes. Yes, he threatened to kill them. Including if the authorities were to try to arrest him, correct? Yes. So your clients knew if we're believing her, and you're telling us in some part we have to believe her, so I guess we're supposed to, from your position, believe pretty much everything she says about his relationship to the children. They knew that going in in this fashion was endangering the children. Yes, no question about it. And as it turns out, the two-year-old shot in the head. Yes. As a result of what your officers did. As a result of an attempted arrest, that's correct. Yeah, okay. That doesn't strike me as a last-minute decision. It sounds to me as though they had quite a bit of time to think about it, and then they went ahead and did it. Well, we'll get to that point. They – my point is there was a balancing of risks. Once – I mean, hope is not a plan. The information law enforcement had was he's not separating himself from the children. That's the information. You don't plan on hope that there is going to be separation. And they had to go with the information they had. And I think the evidence is consistent with what you're saying, that they pretty much decided that if he wasn't going to leave the children, they were going to try to arrest him right then and there. And they didn't decide that at the last minute. They knew that going in sort of before they even started the operation. Is that right or wrong? It depends on all the risk involved. I mean, given the facts they had, there was going to be a risk of harm to the children sooner or later, assuming there was going to be arrest. They accelerated the risk of harm to the children by the deputy marshals deciding on plan B. It was an acceleration of that risk. What evidence do we have as to why the state troopers declined to participate in any operation premised upon having the children present? We have a false position, a false premise from the troopers. Which is? That they would not participate in the plan. It was announced by Captain Bowman. They're not going to participate in any plan unless there's a guaranteed separation of the children from the father. And he admitted it was a false position because that could never happen. And that's, in effect, a decision of never arresting. And he admitted it because he didn't trust his sergeant to make the appropriate balancing of the risks. That's in the record. Well, by definition, when you talk about a plan A and a plan B, there's considerable forethought involved, right? There's some forethought, yes. Okay, and? For plan A. Okay, but there was a plan B also, right? And that was decided on the scene by the deputy marshals without consultation with the three Homer officers. Yes. But they go in with a plan that, I suppose, by definition, it might not work. So can't we assume that there was a plan B, which is if plan A doesn't work, this is what we're going to do? Is there anything in the record to back that up? No, there's nothing in the record to back up that there was a contingency plan if plan A failed. So your clients want us to treat this as basically a decision had to be made in milliseconds, and you had to act without a forethought, and they're trying to do the best they could. Is that essentially what your position is? Yes, that there was fast-paced circumstances with competing obligations, and they had to make a decision as to whether they were, my clients, were they going to rebalance the risks after they heard about plan B within that minute or two. When you say they heard about plan B, how did they hear about plan B from your perspective? They were standing in the hallway behind somewhat adjacent to the car rental counter, and they were then informed that he's not coming in, and what we want you to do is go out there and box him in from the rear. And then he started walking off to accomplish that plan within two minutes. So it was a two-minute window then? Yes. And we are arguing that when you're told the plan has changed and you've got to go out and box in the vehicle, that tends to focus the mind on how am I going to execute this plan and not get killed, and they did not have an opportunity to rebalance the risks at that point. Why not? I mean, they're sitting there thinking about what they're going to do. They have plenty of opportunity, unless you think they can't think faster than a snail. I mean, you know, it's in their control as to when they move in. He's just sitting there in the car. They were told he's not coming in, that a reasonable officer would have reacted that he's going to be leaving, and the marshals are telling us this is the plan, we need to take him. And realistically, if they're going to be risking their lives, as they're being told to, by confronting him out there with Plan B, their focus is going to be on how are we going to accomplish that. Typically when we have the spur-of-the-moment defense in a qualified immunity case, we're very sympathetic if, you know, the officers are confronting someone who reaches into his waistband and pulls something out of the waistband and they think it's a gun. Classic qualified immunity. They really do have just seconds or even milliseconds. This is not that case. Well, I think it is that case in the sense that a reasonable officer could have believed he's going to be leaving. He's not coming in. We have to do something. And it was the marshals, the deputy marshals, that made that decision what we're going to do. Well, you know, we have to do something. And another option would have been we will not arrest him at this time. Yes. I mean, the classic Graham v. Illinois argument is the felon is fleeing, and the officer at that time has to balance off risks. And one of the options that the officer has to have in his head, Graham tells us this, is to allow him to escape for now. And let me talk to you about, let me address the different risk balancing and the difficulties these officers and marshals would have and any home or police officer trying to rebalance the risk. Let's take plan A, the risk inherent in plan A. It eliminated the risk to the children, assuming it worked. Plan A, which was deemed reasonable by the plaintiff's experts, there was considerable risk to the public. It was going to happen in a busy airport terminal with high school students and family arriving. The plaintiff's experts said it's a reasonable balance. Plan B involved significant risk to the children, no doubt about it, but it minimized the risk to the public. It minimized the risk to the public because this was going to go down and did go down at the far end of the airport. And it was this balance that... If it's so risky, you just don't go forward at this time. You wait your chance and try to arrest him at another time. I mean, that has to be an option. It was an option that your people decided against. And let's talk about that option and what the plaintiff's experts concluded regarding alternative plans, letting him go. We have one expert, Emanuel Johnson... You say letting him go. I say try to arrest him at another time. They mean the same thing. They do mean the same thing. I'm assuming there's going to be an inevitable arrest at some point. We're not going to give this guy a free pass. He's violent, and he's a drug offender. Let me just, as you go along, Mr. Daly, I want to make sure I understand a couple of things. My recollection from the record was that there had been numerous other chances. They tried to get him earlier, and because of the situation and proximity of other people and whatever had happened, they didn't go forward at that point. Is that correct? No. That's not correct. No, they never knew where he was. Okay, so this is the first time from your government's perspective, your city's perspective, the first time that they had him there, even though he had the children, is that right? First time they saw him. They saw him. Yes. There was a plan, an earlier airport plan, he never showed up. Right. First time they saw him. Yeah, I got a plan. Why don't you put one of those little GPS things underneath his car? Then you'll know where that car's going to be. Let's talk about that. What risk is there to the children of putting a little GPS thing on the undercarriage of the car? As the facts turn out, he was at a cabin at the time of his death. One of the plaintiff's experts suggested that you do a nighttime assault when you find him. You let him go, you ultimately find him, he's at this cabin, you do a nighttime assault. The other plaintiff expert concluded that's too risky. We have two experts disagreeing over the balancing of risks, and one of my points is . . . I think one of the problems is that the district judge was on to . . . I'm not in a position to say what the best police practices were going to be. The district judge says, you know, there's enough dispute here as to whether or not the children are being constructively held hostage and so on, that let's have a jury sort this out. But, again, there seems to be a failure of imagination if the only two alternatives occurring to the defendants are . . . either we arrest him now with the children to put them in danger, or we do a midnight raid on a cabin where we can find him. Those do not seem to me an exhaustive list of the possible options. And, there's more in the record, and I can address that. The deputy marshals considered sending one of the deputy marshals out, pretending to be a car rental agent. And, when Anderson would get out of the vehicle, would grab him, subdue him, and arrest him. They rejected that plan as too risky. One of plaintiff's experts said that's what should have been done. That was a reasonable alternative. And, a reasonable officer could conclude, if Peter Sarna was there having the discussion with the two marshals as they decide, what are we going to do now, he's not coming in on plan A. If Peter Sarna was there, he'd have said that. Gwen, you should go out there and arrest him. A reasonable officer could say, no, we think plan B is better because we've got four officers trying to arrest him. And then, Sarna might say, well, that's too risky for the children. But, I would suggest to you that sending Gwen out there trying to grapple with him could lead to a shootout. And, that's risky for the children also. Every alternative plan involved a risk of harm to the children because he was always with them. And, this nighttime assault, if there was a nighttime assault and he used a flashbang device, he's got a pit bull with him. Pit bull may likely have given a warning about before they start entering that house. And, it only takes a few seconds for him to get a gun and either shoot the children or shoot at the police. Yeah, okay. Let's hear from the other side. You've used your time, but we'll give you two minutes to respond, whatever time you need. Thank you. Good morning. Please, the court. My name is Tim Ford. I represent... If you'd lift up the mic. Thank you. I represent Cherry Deesman and her children. Every alternative plan involved risk. Life involves risk, but there was no plan that involved more risk than what they did. It was the craziest, most dangerous possible thing they could do to run up on this guy in an uncontrolled situation without planning and box him in with the children trapped in the car with him. Nobody has ever said that that was a plan that anyone would have made rationally with deliberation. And there was deliberation. And that's one of the reasons why I am really concerned about the interlocutory nature of this appeal and the ability to characterize things as immaterial facts. There are very great factual disputes about the hostage issue. The children were never taken away from him.  They did this plan. I remember they came up with this plan on one day's notice. It was unexpected. They didn't know that he was going to be going to the airport. Things developed. They had an opportunity. They tried it. If they really believed that he was never going to go away from the children, why would they have tried it? Of course they didn't believe that, and guess why? They had information that he'd gone snowboarding the previous week for two days and left the children with someone else. That's what they were told. We have that at page 277 of the S.E.R. That was the statement. And while we talk about the emergency nature of this and the need to rescue these children, in fact what happened is these marshals left town on the 22nd of February, and they were gone for five days. And during that time, no one was looking for these children. No one was trying to rescue them. No one was doing anything about Jason Anderson until they came back in on the 27th, and they came up with this idea of let's take him, and the Alaska State Troopers said two different plans. No, it's too dangerous unless he's separated from the children. We will not participate in an extraordinary message to another police department about what they're planning to do. Mr. Ford, along that line, one of the things that your opposing counsel said that doesn't square, at least with my reading of the record, is exactly when this planning took place, how long it occurred, because as my colleague indicated, most of the deference we give to police officers is almost instantaneous. They see the guy reach for what they think might be a gun, try to protect their own lives. In Porter v. Osborne, we said five minutes was insufficient time to deliberate, but it sounds to me like, and I'd appreciate your correcting me if I misunderstand this, this was an ongoing plan of multiple days or even weeks to get this guy. We examined one thing, it didn't work, tried something else, it didn't work. There's kind of a day and a month that occurred here, but the reality is, wasn't this plan B, if you will, one of the things that had been considered before, one possibility that had been considered? That's absolutely true, and I think that that's been really lost, and the district court ferreted that out. You recall where that is in the record? Yes, there are a couple of places you can see that. Number one, you can see it in Officer Hutt's testimony. Where is that in the record? We quote it at our brief on page 12 through 13. We quote it at length, where he says, under cross-examination, he finally comes out and says, no, we were going to take him no matter what, if he came into the building or not. He was dangerous to the public, he was selling drugs, we were going to arrest him no matter what. And we know that that was true because also Agent Olson, or Marshall Olson, testified that they, at the meeting, before they went to the airport, he discussed the possibility that if he doesn't come in, I will need your help outside. They had what they called a whiteboard, where they hatched this plan B. So the concept that your opposing counsel has given to us, that in fact, the plan B was just last-minute happenstance, is, from your perspective, entirely incorrect. Well, that's the factual issue, I think, that the district court fastened on. And I think that that's an important, you know, if you look at the scenario, this is the day after the Alaska State Troopers had said, we won't participate unless he's separated. And then the next day, the Marshall and the Homer police, without the Alaska State Troopers there, are saying, well, if he doesn't separate, we're going to take him anyway out in the parking lot. So when the state police said they weren't going to participate, they were obviously responding to a proposed plan, right? Two plans, I think. Two plans, exactly. And one of those was what has been called Plan B, which was, we're going to go out and take him even though the children are there, and they said, I'm not going to participate in that. I think the plans on the 27th involved a location, not at the airport. Not at the airport, but it is still a similar situation where the children were still there and he was still there. Right, and that's the other thing. This is not rocket science. There was one message, which was, you can't take this guy while he has the children with him. It will be too dangerous for the children. There will be a shootout. And there was. That message was right there in the police officer's head. They'd heard that from these state troopers who'd walked away from these other plans just the day before. And that's the other part of the not split second, because when the marshals came to them, they didn't say, oh my God, he's getting away. He's threatening to do something. They said, it's time to apprehend him. That's all they said, according to Officer Hutt, when they came to them. And the officer just went on out, just like they had, we believe, discussed earlier. They were simply ignoring what had been told them the day before. They were being deliberately indifferent to this issue that had been put very squarely in front of them about the degree of danger to these children. And they were doing something that had no control and was inevitably, according to our expert, going to result in either Jason Anderson shooting somebody or somebody shooting somebody. He said 75%. I think it's 100% that at that moment, in that chaotic situation that they put together, by pulling in front of him without even planning enough to have a gun drawn or a seat belt off or telling each other what they're going to do, that Jason Anderson was going to make some kind of a move that was going to start the officers shooting. Once the officers started shooting, of course, remember, they had themselves in a crossfire. They were so completely disorganized. So Olson couldn't even shoot because the other officers, he had to get out of the way of the line of fire that they had set up. So, Mr. Ford, given the scenario, at least as you view it, do you think we have jurisdiction? You heard what I said to opposing counsel in terms of these two issues that, at least by my light, seem to be rather material, factual issues. Our case law is real clear. If it's an all-legal issue, we certainly want to have people avoid a trial if it's just a legal issue. But if these are, in fact, material, factual issues, should we be even considering the merits of this or should it be going back to the district court to have a jury look at those issues? Well, I certainly think they should go back to the district court, and I think there's a jurisdictional problem. And we said in our brief, the appellants have never said, even if the children were hostages and even if there was time to deliberate, this still was objectively reasonable. Those are the two major issues. Those are the major issues at the court. I think you may be talking across purposes. The question that I have jurisdictionally is, do we have jurisdiction to decide whether summary judgment was properly denied? I think the answer to that is yes, because if we were to conclude, as I'm inclined to conclude, there are material issues that should be decided by a jury that have to be decided, well, that means that summary judgment was properly denied. But when summary judgment is denied to a defendant who's asked for summary judgment based on qualified immunity, we have jurisdiction over that as an interlocutory matter. Isn't that right? It certainly is a practical matter, Judge Fletcher. How about as a legal matter? As a legal matter, I think it becomes extremely difficult. And I actually had the other Judge Fletcher ask me a question in a case in exactly this posture, with exactly this problem, saying, why are we still here? Why wasn't this dismissed? And the answer is this court, and I don't know if any appellate court, has the procedures in order to cut through the rhetoric and figure out whether there really are factual disputes before you get to oral argument. And by that time, you're basically, why not have a decision? We're all here. We can talk about the materiality of these facts. So I don't know the answer to that. There's actually a very clear Supreme Court case that says we do have jurisdiction when the defendant has asked for a summary judgment on qualified immunity and has denied it. We have interlocutory jurisdiction on that. The court perhaps has jurisdiction. I certainly wouldn't contest that. I think the parties may be improperly invoking the jurisdiction when they do not candidly go to the court and say, yes, there was evidence that Jason Anderson went snowboarding and left the children for two days. Yes, there was a possibility he would leave the children at a later time, just as we hoped he would on this day. Well, that just means they've got a lousy appeal. Well, I think that they've perhaps not been as candid with the court as they should be to let the court make its decision on jurisdiction. But again, we're here. I think the factual disputes clearly exist. The district court was correct. Parenthetically, under Alaska law, I think there's even more of a question because Alaska law gives courts discretion to do exactly what Judge Bryan did, which is to say, I'm going to deny this without prejudice and see what comes out at trial. I assume we will have special verdicts, and the judge will rule again on qualified immunity depending on what the evidence says at trial and what the jury finds. Does the fact that the ruling was without prejudice have any bearing on jurisdiction? I think it does. There's a second line of cases that says any ruling that is without prejudice or is a tentative can be questioned as being a not final ruling, and I think that applies to qualified immunity rulings as well. And I think that that was wise of Judge Bryan. Remember, he had federal defendants in the case at the time, also had a very complicated set of facts, a very large record, and I think he said that there were disputes, but it was possible at trial that those disputes could be hashed out in a way that qualified immunity could be revisited. Excellent. It's not in front of us, but could you just fill us in a little bit? What's happening with the federal defendants? I understand that's not in front of us. It is resolved, Your Honor. It was settled. Okay. Unless the court has additional questions, thank you very much. Would you like two minutes? In the brief, Mr. Ford took the position that regarding the seizure issue, that should be decided as a matter of law and by the Ninth Circuit, and there aren't any factual disputes regarding that issue. What it's going to turn on is how much knowledge you attribute to this reasonable passenger, if that's the test. It'll turn on that, and maybe the definition of hostage, as the district court seems to suggest. But that will resolve the issue. A fact is not going to resolve the issue. The facts are undisputed, so it's either going to be your definition. With respect, counsel, maybe I'm missing the boat here, but whether the children were being held as hostages has a major impact on which area of law we're following, which cases we're following, doesn't it? It does. And the whole issue that we've been talking about in terms of whether the officers had time to deliberate has a major impact on this, right? Right. So if that's true, and if, at least as I understood it, the judge didn't make a decision on those, he was concerned about that, which is why he denied or he made a decision without prejudice, because he thought that this was a jury question, did he not? Yes, but the reason why, in my view, it's not a jury issue is which definition do you apply? Which one is he going to choose? That'll resolve it. Also, what attributed knowledge do you give to the reasonable person in the children's position? That'll resolve it. But whether they're hostages or not, and I'm here entirely in agreement with Judge Smith, that depends on some facts that are disputed. It does not, in my view. For example, Your Honor, if you attribute some knowledge to this reasonable passenger in the position of the children, if you attribute that they knew they were going to get killed by their father because he made those threats, if they were comprehending and the mother told them that, they would view the police officer as a rescue rather than a restraint. Well, that's a very big if. We've got a 2-year-old and a several-month-old. Yes. And they're supposed to decide whether they're hostages? No, I'm assuming your test is going to be a reasonable passenger. If you were just going to take their actual expectations, they had none. But I'm not making the argument we ought to win because they didn't view it as a restraint. Isn't it absurd to argue that a 2-year-old and a 2- or 3-month-old child could be the reasonable passengers? How do you even not get there? I mean, are we going to give them cognitive abilities, the members of VINSA? What are we talking about? No, I'm just trying to suggest I don't know what test you're going to apply. If you apply actual expectations, they had none. So they didn't view it as a restraint, the box in, and thus there's no seizure. Okay, got it. Regarding deliberative time, I suggest a plan is only an intended action based on hypothetical facts. The officers had to decide what to do when the true facts came out, when he was parked at the area parking lot, and you shouldn't include planning time as you consider whether they had deliberative time. Okay, thank you very much. Thank both sides for your arguments. Dietzman v. City of Homer, et al., now submitted for decision.
judges: Goodwin, Fletcher, Smith